
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 2 1 2017

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

OTIS D. POWELL,                     §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §   NO. 4:16-CV-1130-A
                                    §
UNITED STATES OF AMERICA,           §
                                    §
            Defendant.              §

MEMORANDUM OPINION
and
ORDER

This is an action by Otis D. Powell ("Powell") against
United States of America under the Federal Tort Claims Act,
28 U.S.C. §§ 2671-2680 ("FTCA"). The government has agreed that
Powell exhausted his administrative remedies.

The court has concluded that the Federal Bureau of Prisons
("Bureau") violated the duty of care it owed to Powell, that
Powell was damaged by that violation, and that the government
should compensate Powell for his damages.

I.

Nature of Powell's Complaints

Powell's live pleading is the amended complaint he filed
July 31, 2017. Doc. 44.[1] In a general way, his alleged

---

[1] The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in
this Case No. 4:16-CV-1130-A.

complaints are as follows:

He was shot during an altercation at a bar in 2007. Over the years, the bullet migrated through his body until it came to rest against various nerves, and under the skin on his left shoulder, causing him extreme pain and discomfort. The Bureau failed to provide him the care it was legally obligated to provide for treatment related to the bullet that was migrating through his body. On many occasions, he unsuccessfully sought from the Bureau medical attention for the problems he was suffering by reason of the migrating bullet, including requests for surgical removal of the bullet. His repeated requests for surgical removal of the bullet were denied, and he was not provided the relief he needed from the pain and other difficulties he was experiencing by reason of the existence of the bullet under his skin.

His final attempt to obtain proper care from the Bureau related to the migrating bullet was on December 29, 2014, when he informed medical personnel at the prison where he was then confined, FMC Fort Worth, that he was having difficulty sleeping on his left side and discomfort because of the bullet in his body, but he was not provided appropriate care at that time, and was denied access to a doctor to discuss the issue. That led to his decision in early-January 2015 to remove the bullet himself;

and, he did so by cutting it out with a razor blade in his prison cell.

When he reported what he had done to prison personnel, they treated the wound created by Powell's self-performed surgery, and promptly issued a disciplinary report accusing him of self-mutilation, an accusation that ultimately caused him to receive discipline, including loss of privileges, loss of quarters, loss of good conduct time, and disciplinary segregation.[2]

## II.

## Findings of Evidentiary Facts

### A.   The Trial Evidence

The bench trial of this action was conducted on August 28, 2017.  Powell testified on his own behalf.  The government called as its witnesses two doctors who had seen Powell at FMC Carswell, Charles Eilert, D.O., a medical officer at FMC Carswell, and Syed Fateh Hyder, M.D., a clinical director at FMC Carswell.  The court received in evidence all exhibits shown on the exhibit lists filed by the parties, Docs. 78 and 79, plus two exhibits (Exhibits 9 and 10) that were added to the government's exhibit list during the course of the trial, Doc. 79 at 2.  In addition,

---

[2]By order issued August 25, 2017, his complaints concerning the disciplinary action taken against him were severed into a separate civil action characterized as an action brought by Powell under 28 U.S.C. § 2241.  Consequently, the propriety of the disciplinary action is not an issue to be resolved in the captioned action.

an exhibit identified as Court's Exhibit 1 during the trial was received as evidence.[3]

B.  Evidentiary Facts Established by the Trial Evidence

1.  Places of Confinement and Pertinent Entries in Medical Records

The court starts its detailed findings of evidentiary facts with a discussion of Powell's places of confinement, followed by a discussion of pertinent entries in the medical records of each of those places.

a.  Places of Confinement by the Bureau After Powell Was Sentenced in January 2009

The records of the United States District Court for the Eastern District of Texas show that Powell was sentenced in January 2009 to a term of imprisonment of 188 months. No. 1:08-CR-00010-001, E.D. Tex., Doc. 35-1 at 2. Items in the medical records that were provided by the government at trial as its Exhibit 1 indicate that Powell's first place of confinement by the Bureau was at its Milan, Michigan facility, Gov't Ex. 1 at 035, that he was transferred to the Bureau's Terre Haute, Indiana facility in August 2013, id. at 138, and that he was then transferred to one of the Bureau's Fort Worth, Texas facilities

---

[3]A redacted copy of Court's Exhibit 1 is an attachment to a document titled "Defendant's Response to Court's August 28, 2017 Request for a Partially Redacted Copy of the Dec. 3, 2014 Utilization Review Committee Meeting." Doc. 82.

(Federal Medical Center Fort Worth, a/k/a FMC Fort Worth) in
March 2014, id. at 167-68, where he remains.

b.    Pertinent Entries in the Medical Records

The government represented that its Exhibit 1 was the
"Complete Medical Records for Otis Powell." Doc. 79 at 1. Those
records appear to contain daily entries pertaining to health care
provided by the Bureau to Powell starting in mid-2009 and going
through December 2016. Gov't Ex. 1. The attachment to this
memorandum opinion and order, which the court incorporates herein
for all purposes, summarizes, and in some instances provides
relevant quotations from, those records.

Powell called to the attention of the medical personnel at
Milan in mid-2009 the existence of the bullet in his body and a
problem it was causing him. Id. at 006. He repeated his
concerns about the bullet to the medical personnel at Milan in
December 2009, id. at 002, again in February 2010, id. at 086,
again in March 2010, id. at 045, and again in August 2011, when
he complained that the bullet hurt "when he lay down," id. at
090. In September 2011, an x-ray was made of the area about
which Powell complained, which disclosed existence of a bullet in
his body. Id. at 091 & 107.

After Powell was transferred to Terre Haute, his problems
with the bullet increased. On August 6, 2013, he reported during

a physical examination that the bullet was causing him "intermittent pain," id. at 124, and the examination disclosed "weakness at left hand" because of the gunshot wound, id. at 127. In January 2014, he was seen by a registered nurse at Terre Haute with a complaint that he was having a burning, sharp pain because of the bullet in his shoulder. Later that month he saw a medical doctor at Terre Haute, who noted that the bullet had migrated and was now just under Powell's skin, and that Powell found it uncomfortable, with the result that Powell was taking Ibuprofen. Id. at 158. That visit was before Powell's transfer from Terre Haute to Fort Worth. Under the heading "Plan," the examining doctor made the following entry:

> As inmate anticipates transfer soon, he was advised to present to health services at receiving facility regarding removal of bullet. It is just under the skin and does not present any musculoskeletal impairment.

Id.

In the record pertaining to Powell's transfer from Terre Haute to Fort Worth, there was a listing under health problems of a chronic weakness in Powell's left hand because of the 2007 gunshot wound. Id. at 167.

After Powell's transfer to Fort Worth, and during his initial medical evaluation in Fort Worth, there was an entry dated April 3, 2014, concerning the current painful condition the

bullet was causing Powell to experience, followed by the entry "Left Shoulder Blade-Bullet Location Causing Pain. Reports Pending Surgery Before Transfer." Id. at 165. The next day, on April 4, 2014, is when Powell was seen by Dr. Eilert, who noted that Powell had a bullet under his skin that he was requesting to be surgically removed. Id. at 155. Dr. Eilert observed a lump in the shape of a bullet under his skin, which was superficially moveable over the left scapula. Id. Dr. Eilert was concerned enough that he sought consultation for performance of surgery to remove the bullet. Id. at 157. The consultation was requested on April 4, 2014, and the target date for the response was April 8, 2014. However, the consultation request was denied on May 6, 2014, with the notation "No clinical indication for removal." Id. at 206.

On June 17, 2014, Powell was seen by a registered nurse, complaining of pain of number 6 on the pain scale because of a bullet that was coming out. Id. at 152. He informed the nurse that he was taking about four Ibuprofen at night, but that it did not help. Id. The assessment the nurse recorded in the records was as follows:

ASSESSMENT:

. . . .
Inmate has had multiple complaints of same issue; he is requesting that the bullet under

7

> his left scapula be removed. States it is
> causing him "real bad" pain, especially at
> night. Foreign body can be felt under left
> scapula. Inmate did not appear to be in
> distress during this encounter. Will
> schedule for further eval by provider.

Id. at 153.

Powell was seen by Dr. Fateh Hyder on November 28, 2014,

when Powell complained that the pain from the bullet became worse

two days earlier, that the pain was number 7 on pain scale, and

that it was a burning pain. Id. at 147. Again Powell urged that

the bullet be taken out. When the doctor examined Powell, he

noted a palpable bullet fragment. Id. at 148. A radiology

report was again requested, id., and Dr. Fateh Hyder made another

request for general surgery referral, stating that the lodged

bullet fragment was causing pain, and that the patient wanted it

removed, id. at 149. The doctor prescribed a pain medication for

Powell, instructing him to take one pill, orally and with food,

twice daily. Id. at 182. The general surgery referral requested

by Dr. Fateh Hyder was disapproved on December 10, 2014. Id. at

209. The reason for the disapproval was "Limited Medical Value."

Id. at 209, 269.

Powell was seen again by a registered nurse on December 16,

2014, with complaints of pain in his shoulder and neck, which he

described as number 7 on the pain scale and with the words "Pins

and Needles," again referring to the bullet lodged in his body.
Id. at 144-45. On December 22, 2014, Powell again arranged to be
seen by a registered nurse, with a complaint of pain in his left
shoulder and neck, which he described as a number 6 on the pain
scale. He told the nurse that he had been unable to sleep on his
back, had intermittent "pins and needles" feeling to his left
side, and that his left arm felt paralyzed at times. Id. at 142.
The nurse recorded that his anti-inflammatories were ineffective.
Id.

Powell's final visit to medical personnel before he removed
the bullet himself was on December 29, 2014, when he was seen by
a nurse practitioner. Id. at 139-140. The following entry was
made in that record:

> Inmate requesting bullet removed from left shoulder
> blade d/t GSW seven years ago. Inmate reports
> difficulty sleeping on left side and discomfort.
> Inmate has made multiple attempts at this facility and
> previous facility to have bullet removed. Inmate
> advised consult to general surgery was disapproved.
> Advised not medically indicated at this time. Inmate
> states, "will just have to write somebody up to get
> this removed." Xray results pending.

Id. at 139. The December 29, 2014 x-ray report confirmed that
there was a "ballistic fragment" in the area of Powell's left
scapula. Id. at 192.

On January 6, 2015, Powell was seen by a registered nurse concerning his wound from cutting the bullet out himself on January 5, 2015.  Id. at 222.

The only other entries in the medical records for the year 2015 pertaining to the area of the body where the migrating bullet was located and from which it was cut are a listing of dates in January when Powell's wound was dressed, id. at 241, and an entry in January when Powell expressed difficulty climbing into his bunk because of the wound, id. at 219.  There are no entries in Powell's 2016 medical records that appear to bear on the part of Powell's body where the bullet was migrating or the place where it was cut out, thus indicating that while Powell was having significant problems because of the migrating bullet before he cut it out, those problems went away once he performed his self-surgery.

　　2.　Summary of Trial Testimony and Exhibits

　　　　a.　Powell's Evidence

　　　　　　i.　Powell's Exhibits

Powell testified at the trial, and his thirteen exhibits (Plaintiff's Exhibits A through L) were received as part of the

trial record.  Powell's exhibits A through I are copies of what
he considered to be pertinent parts of his medical records.[4]

Powell's Exhibit J is not relevant to the issues to be
resolved in this action now that the disciplinary investigation
and penalties imposed on Powell for his self-surgery have been
severed into a separate action.  The remaining exhibits, Exhibits
K and L, are policy and procedure publications of the Bureau, one
Exhibit K, pertaining to Scope of Services and the other, Exhibit
L, pertaining to Elective Surgery.  There is an entry in Exhibit
L that has relevance to this action because it bears on the
ability of Bureau personnel to perform elective surgery, such as

---

[4]Exhibit A are records pertaining to the events and activities discussed on pages 2-4 of the
attachment to this memorandum opinion and order under the dates March 25, 2010, August 29, 2011,
September 12, 2011, January 13, 2014, and January 31, 2014; Exhibit B are records pertaining to the
April 3, 2014 initial medical evaluation, discussed under that date on page 5 of the attachment; Exhibit C
are parts of the records that are discussed under the date June 17, 2014, as shown on page 7 of the
attachment; Exhibit D are records pertaining to the same things described in the December 22, 2014 entry
on page 12 of the attachment; Exhibit E are parts of the records pertaining to the clinical encounter
described under the date of December 29, 2014, on page 13 of the attachment; Exhibit F is the record
pertaining to the April 4, 2014 visit by Powell with Dr. Eilert, discussed under that date on pages 5-6 of
the attachment, and it also includes a copy of a "Consultation Request" document, showing Dr. Eilert's
request for general surgery for removal of the bullet, discussed on page 6 of the attachment; Exhibit G
are records pertaining to Powell's visit with Dr. Fateh Hyder on November 28, 2014, discussed on pages
8-9 of the attachment under that date, together with Dr. Fateh Hyder's consultation request, discussed on
page 10 of the attachment and the December 10, 2014 denial of that request, discussed under that date on
pages 10-11 of the attachment; Exhibit H is a copy of the x-ray report shown under the date December
29, 2014, on page 13 of the attachment, along with a copy of the x-ray film; and, Exhibit I is a copy of
the record discussed under the date January 6, 2015, on pages 13-14 of the attachment, pertaining to
Powell's self-surgery to remove the bullet.

the surgery Powell self-performed.  At page 2, there is the following explanation:

> Within their delineated privileges and practice agreement, the [Mid-Level Practitioners], Clinical Director and Staff Physicians may perform elective surgery in the Urgent Care Room of the Clinic.  All elective surgery procedures will be done under local or topical anesthetic and should not require extensive periods of convalescence requiring frequent nursing care.

Pl.'s Ex. L at 2.

### ii.  Powell's Testimony

Powell, who was not represented by counsel, gave limited trial testimony in narrative form on his own behalf.  He confirmed that the problem with the migrating bullet started while he was an inmate at Milan, continued while he was an inmate at Terre Haute, and, notwithstanding his complaints, continued once he became an inmate in Fort Worth until he removed it himself.  Doc. 86 at 14.

He described the difficulties the bullet in his body was causing him, much the same as he described the problems to the Bureau medical personnel, to which he received responses such as "it ain't life threatening."  Id. at 14-15.  He made the point that he was the one who felt the pain in his body, and that the health care providers he dealt with did not feel the pain.  Id. at 15.  The two doctors who saw him in Fort Worth, Drs. Fateh

Hyder and Eilert, both told him that the bullet should be removed. Id. However, when each of those doctors submitted surgical removal for approval, it was disapproved. Id. at 15-17. He was never told why the request for surgical removal was disapproved, and he did not know until he went through his medical records. Id. at 17-18.

He told the medical personnel at Fort Worth numerous times that the bullet fragment in his body was keeping him from sleeping on his left side and that he could not move his left arm above his head without experiencing extreme pain. Id. at 26-27.

Powell explained what led to his decision to perform his self-surgery for removal of the bullet by saying:

> THE COURT: Why did you cut it out?
>
> MR. POWELL: Because I was in -- I was in pain. I was in -- I was in pain, Your Honor, and after I seen I couldn't get no medical treatment, I just couldn't take the pain no more.
>
> THE COURT: How long after you had last gone to the doctor there at the prison was it before you decided to cut it out yourself?
>
> MR. POWELL: I went -- I was going there numerous times asking for help. They also noticed I was -- I told them I was paralyzed and having pain in my neck and it shut my left side down, so I just took matters in my own hands because I couldn't get no help.
>
> THE COURT: Well, how long before that had you last gone to the doctor there?

     *MR. POWELL:* Last time I went to the doctor was December the 29th.

     *THE COURT:* And when was it you decided to take the matter into your own hands and cut it out?

     *MR. POWELL:* January 6, 2015.

     *THE COURT:* What were you told the last time you went to the doctor complaining about the bullet there?

     *MR. POWELL:* My --

     *THE COURT:* Pardon?

     *MR. POWELL:* My provider said she wouldn't sign her name for no surgery or none of that.

Id. at 27-28.

     b.   <u>The Government's Evidence</u>

     i.   <u>The Government's Exhibits</u>

Ten items identified as exhibits for the government were received in evidence. Pertinent parts of Exhibit 1, the complete medical records, have been summarized in the attachment to this memorandum opinion and order. Exhibits 2-7 all appear to pertain to the disciplinary action taken by the Bureau against Powell by reason of his self-surgery, which would have potential relevance to Powell's claims on that subject that have been severed into a separate action. Exhibit 7 appears to be the claim form Powell submitted to the Bureau as a predicate to the bringing of this action. Exhibit 8 is the Bureau's denial of Powell's tort claim. Exhibits 9 and 10 are documents produced by the government during

the course of the trial in response to the court's request for a
document mentioned by one of the government's witnesses.

ii. <u>Dr. Eilert's Testimony</u>

Dr. Eilert is licensed to practice medicine in Michigan and
Missouri, but has been employed continuously by the Bureau at FMC
Fort Worth since July 2010. He is a family medicine physician in
the clinic area of the facility, where he sees "pretty much the
whole gamut of patients who come through." Doc. 86 at 38. The
standard of care he uses in determining what treatment to give a
patient is based on his general medical training from his
residency program.

He said that he did not recommend removal of the bullet
fragment, but consulted general surgery for their general
surgeon's opinion. He did that because Powell requested that the
bullet come out. While it was not his opinion that the bullet
should come out, his opinion was that the general surgeon should
evaluate Powell.

When he examined Powell, Powell's vital signs did not
demonstrate that he was in pain. The only time he saw Powell was
in April 2014, shortly after Powell arrived at FMC Fort Worth.
His visit with Powell was to perform Powell's initial physical
evaluation after his arrival. Powell told him that he had a
bullet under his skin over his left scapula, and Powell requested

surgical removal of the bullet. In explanation as to why he did not remove the bullet himself, he gave the following testimony:

THE WITNESS [Dr. Eilert]: Well, initially my -- I didn't feel comfortable removing a bullet myself.

THE COURT: What would you have had to have done to remove it yourself?

THE WITNESS: We would have had to open the -- sterilize the area, and then make an incision and then take the bullet out.

THE COURT: Like he did?

THE WITNESS: Correct.

THE COURT: Well, is that something that could be done there in your office?

THE WITNESS: It could be done. I had two concerns. Number one, it was -- since the bullet was -- apparently someone shot him, I was concerned that there may be an open case, legally, for the bullet, for me to take the bullet out, and now it becomes an evidence situation. And number two, I didn't feel comfortable myself removing a foreign object from the body. A general surgeon can do it, but I didn't feel comfortable doing it.

THE COURT: You didn't feel comfortable doing it, and that's why you referred to general surgery?

THE WITNESS: Yes, sir. That's correct.

THE COURT: And you were also concerned that it could be evidence in some proceeding?

THE WITNESS: Yes. Yes.

THE COURT: Is that one of the reasons why you didn't remove it?

THE WITNESS: Yes, sir.

> THE COURT: What kind of -- would local anesthetic
> do the job?
>
> THE WITNESS: If it's superficial, possibly, yes.
>
> THE COURT: And did it appear to be superficial?
>
> THE WITNESS: If you could feel it, yes. From what
> I could remember, it was under the skin and it was
> mobile, yes.
>
> THE COURT: You could feel it, and it --
>
> THE WITNESS: Mobile.
>
> THE COURT: You could feel it, and it would move
> around under the skin?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: So it was almost out?
>
> THE WITNESS: It was under the skin, yes.

Id. at 44-46.

When asked if he was aware that personnel at Terre Haute had

indicated that the bullet should be removed, he said that he had

looked through the chart after he saw the patient, "but the

recommendation from another prison don't carry over to our

prison" and that his "judgment at the time was to refer to a

general surgeon." Id. at 46. He testified on this subject as

follows:

> THE COURT: Okay. In other words, if the prison in
> Terre Haute had said that needed to be removed, but we
> don't have time to do it, and when you get to Fort

Worth, they can remove it, that's not something y'all would be bound by?

  *THE WITNESS:* Yes, sir, that's correct.

  *THE COURT:* Would y'all pay any attention to that?

  *THE WITNESS:* We would, but we would -- it's still our judgment since we're responsible for the patient.

  *THE COURT:* Okay. Why don't y'all -- why wouldn't you be willing to rely on the judgment of the people at Terre Haute?

  *THE WITNESS:* We do. We respect them, but we still have to assess the patient ourself, which I did, and then referred to a general surgeon since I didn't feel comfortable removing a bullet.

Id. at 46-47.

He had the authority at the prison to tell the general surgeon that he wanted the bullet removed, but he did not do that. He, instead, "just consulted a surgeon that the inmate requested removal of the bullet." Id. at 47.

When asked why he did not tell the general surgeon that he wanted the bullet removed, he said that he did not consider Powell to be in distress. It possibly could have made a difference in his decision if Powell had started having trouble sleeping by that time and was having pain at that time.

Even if he were to assume that the presence of the bullet in Powell's body was keeping him from sleeping well, he would have referred him to the general surgeon for removal of the bullet,

which is different from sending him to the review committee. He
does not know why the review committee did not approve surgical
removal of the bullet, he only knows that they rejected the
consult. He explained the standard the review committee uses to
decide whether to recommend surgery by saying:

THE COURT: What standard do they use to decide
what decision to make?

THE WITNESS: Whether it's -- resources of the BOP,
is this a critical emergency that should be taken care
of right now, or is it cosmetic and can just wait.

THE COURT: In other words, they take into account
the fact that it's the Bureau of Prisons and that if he
can hold off until he gets out of prison, then they can
wait until he gets out of prison?

THE WITNESS: Yes, sir. Yes, sir.

THE COURT: Is that one of the criteria?

THE WITNESS: Yes, sir. And also, too, he was --
this bullet had been in for quite a number of years
also.

THE COURT: Pardon?

THE WITNESS: This bullet had been in his body for
quite a number of years.

THE COURT: Okay. But that is one of the criteria
that the Bureau of Prisons applied that --

THE WITNESS: Yes -- sorry.

THE COURT: -- you are aware of --

THE WITNESS: Yes.

*THE COURT:* -- that if it's something that he can live with, or in other words won't kill him --

*THE WITNESS:* Yes, sir.

*THE COURT:* -- and until he gets out of prison, then he can wait until he gets out of prison and take care of it?

*THE WITNESS:* Yes, sir.

<u>Id.</u> at 49-50.

Counsel for the government interjected that Dr. Eilert's request for consultation was not sent to the review committee. He assumed that it had been. Sometimes the clinical director makes a decision on a request for surgical consultation, and if he concludes that the matter is cosmetic, it can be rejected simply because it does not have to be done immediately. That is one of the criteria that the clinical director can use. Counsel for the government called attention to a page in the medical records indicating that Dr. Eilert's request for surgical consultation was disapproved by a doctor acting in the role of institutional clinical director with the comment "no clinical indication for removal." <u>Id.</u> at 53. The witness took that entry to mean that the conclusion was reached that Powell "could wait until he got out of prison and get it out himself." <u>Id.</u>

With respect to the concept that medical services will not be provided if the problem is something that the prisoner can

take care of himself after he has served his term of
imprisonment, Dr. Eilert testified:

> *THE COURT:* This concept that if it's not something
> that needs to be taken out now, he can wait until he
> gets out of prison, if it's not something that's fatal
> or potentially fatal. Is that basically what it is?

> *THE WITNESS:* Yes, sir.

> *THE COURT:* Is that something in writing or where
> is that? How do you find that rule?

> *THE WITNESS:* Not that I'm aware of. It's based
> upon utilization of BOP resources. We have a finite
> amount of money to spend, and we have to be able to
> spend the money wisely because we have many patients
> who come with more critical illnesses that we have to
> spend the money on.

> *THE COURT:* Well, if you removed it yourself, it
> wouldn't cost any more money, would it?

> *THE WITNESS:* Personally -- as I said, personally,
> I didn't feel comfortable removing the bullet.

> *THE COURT:* Well, if you had called one of the
> surgeons over and said, come over and help me get this
> bullet out, and he could just do whatever you do to do
> it.

> *THE WITNESS:* We still have to -- we still have to
> put in the consult for the general surgeon to see the
> patient.

> *THE COURT:* Oh, so that's going to cost money to do
> that or what?

> *THE WITNESS:* Just to -- to have the surgeon to
> remove the bullet, yes, it would, yes.

> *THE COURT:* In other words, the surgeon is going to
> cost money, if they do it through a surgeon?

*THE WITNESS:* Yes. Yes.

*THE COURT:* Are those people on the prison staff or are they independent people?

*THE WITNESS:* No, they are part of the UNT staff.

*THE COURT:* Part of what?

*THE WITNESS:* UNT, University of North Texas Health Center, and through JPS also, I believe, and they are outside consultants that come into the prison.

*THE COURT:* And they have to be paid when they do things --

*THE WITNESS:* Yes, sir.

*THE COURT:* -- like removing bullet fragments?

*THE WITNESS:* Yes, sir.

*THE COURT:* And that's a resource problem with the Bureau of Prisons?

*THE WITNESS:* It could be, depending upon the resources available.

*THE COURT:* Okay. Well, could you have taken him to JPS or North Texas and had them remove it? Would they have let you do that?

*THE WITNESS:* We could have, but that would have only been -- as I said, it wasn't an emergency. Objectively to me at the time, he wasn't in extremis.

*THE COURT:* Okay.

*THE WITNESS:* And so it wasn't an emergency to go to JPS and have the bullet removed.

<u>Id.</u> at 54-56.

He interpreted the Terre Haute record concerning Powell presenting his problem to the health services at the receiving facility regarding removal of the bullet to be a recommendation, and not an order. He took it to be a recommendation that the receiving facility evaluate Powell.

When he saw Powell on April 4, 2014, he manipulated the bullet under Powell's left scapula. He explained the signs that normally would exist if a person actually has pain.

He possibly had the authority as a physician to direct lower-level medical providers to perform certain things, such as telling a nurse practitioner to remove the bullet. If he had done that, the nurse practitioner would have been obligated to remove the bullet. He never directed the nurse practitioner, Ms. Walker, or any of the other personnel to remove the bullet. If he had arranged for a nurse practitioner to remove the bullet, it would have cost less money because it would have been done in the clinic.

He repeated that he did not feel comfortable in removing the bullet, and for that reason he would not direct anyone else to remove it; and, the two reasons why he did not feel comfortable in removing it were that he thought it might be evidence in a court proceeding and it was not something that had to be done to save Powell's life. On the subject of his ability to instruct

one of the nurse practitioners to remove the bullet, he said he could have given such an instruction if he had known that Powell had some pain and difficulty and was having trouble sleeping because of the bullet. Even if he had instructed a nurse practitioner to remove the bullet, he or she would have had the right to refuse to do so he or she did not want to do it. He never did find out if one of the nurse practitioners would have felt comfortable in removing the bullet, because he never asked one of them to do it.

He did not reach an opinion from his examination on April 4, 2014, that Powell needed the bullet to be removed.

He has never removed a bullet from an inmate. While he has seen fifteen or twenty patients with bullets in their bodies, he has never requested that any of those patients have the bullets removed. He has never seen another patient who had a bullet trying to get out on its own. Powell is the only one.

The Bureau's regional office could deny a surgical consultation request. He explained the basis of such a denial:

> THE COURT: Well, now why would they deny something?

> THE WITNESS: If they considered -- as I said, they could consider it based upon medical need. Is it critical? Is it an emergency? Or based upon the resources of the bureau, is it something that has to be done immediately or can it wait until a person is released from prison.

> *THE COURT:* That's more of a financial decision.

> *THE WITNESS:* Financial, and also how much -- do we have the resources of the people in the clinic or the prison to perform any procedures, too.

> *THE COURT:* Pardon?

> *THE WITNESS:* Do we have the staff or the resources in the prison to perform the -- whatever procedure is needed.

> *THE COURT:* Well, y'all had that resource at the prison to perform what Mr. Powell needed done, didn't you?

> *THE WITNESS:* Yes, we did. Yes.

> *THE COURT:* So it really became a financial decision not to do it?

> *THE WITNESS:* It became more of just an issue that he wasn't in distress, so it wasn't -- in my opinion, it was more that he wasn't in distress and didn't need the procedure done.

Id. at 67-68.

In explaining why surgical consultations are denied, he said that, ultimately, the decision is based on whether the problem is an emergency requiring immediate attention or was one that could "wait until they get out," which ultimately is the main criteria. Id. at 70.

He explained why he sought a surgical consultation when he saw Powell by saying that he would let a general surgeon evaluate it because "[b]etter to be safe than sorry, have a second

25

opinion, somebody that was more experienced removing things from a person's body than [him]." _Id._ at 71.

His explanation of "limited medical value," which was a reason given for denying one of the requested surgical consultations, was:

> *THE COURT:* What does limited medical value mean?
>
> *THE WITNESS:* That would be --
>
> *THE COURT:* That's a financial thing?
>
> *THE WITNESS:* No, it would be more of a -- is this a -- does it have to be done immediately. We have emergent, we also have urgent, and limited medical value means that it's more cosmetic and that it can wait until he gets out as far as --
>
> *THE COURT:* Getting it out and removing it?
>
> *THE WITNESS:* Yes, as far as they -- he doesn't need to have it done now. Based on what they read in the consult, he was not in any extremis. It wasn't life threatening, so it could wait until he gets out.

. . . .

> *THE COURT:* -- hypothetically that he's in pain, but he is in pain in fact, and it's interfering with his ability to sleep, in fact.
>
> How does that enter into the limited medical value evaluation?
>
> *THE WITNESS:* That would -- they would take that into consideration.
>
> *THE COURT:* Those things into consideration?
>
> *THE WITNESS:* Yes. Yes.

*THE COURT:* But if it's something that they think
he could wait until he got out to get done, then that
would be a limited medical value?

*THE WITNESS:* Yes, and a lot of times it would
depend on did he come, was he requesting a large amount
of pain medicine, was he requesting pain medicine for
the wound -- the injury or whatever soreness, and also
to the physical evaluation that they would note in the
chart also.

*THE COURT:* And all he wanted was to get it out so
he could go to sleep and wouldn't have pain; is that
right?

*THE WITNESS:* That's my understanding, yes.

*THE COURT:* Okay. And that is not -- doesn't cause
it to have a medical value -- a limited medical value,
if that's all it is; is that right?

*THE WITNESS:* Yes.

Id. at 75, 76-77.

The level of care that is provided at FMC Fort Worth is the

level of care that doctors in Fort Worth would provide.  When

comparing what a private practitioner in Fort Worth likely would

do under the circumstances with which the medical personnel at

FMC Fort Worth were faced, he testified:

*THE COURT:* In other words, a private practitioner
here in Fort Worth would take into account to a greater
degree the long-term benefit, such as relieving people
of pain and making them sleep better, they would take
that into account normally in private practice.

*THE WITNESS:* They might. They might.

*THE COURT:* Well, wouldn't they probably?

*THE WITNESS:* Probably, yeah.

Id. at 87.

### iii. Dr. Fateh Hyder's Testimony

Dr. Fateh Hyder is a board certified family medicine physician, and works as a clinical director at FMC Fort Worth. He received his medical schooling in India, did his residency training at University of Texas Health Science Center in Houston, and did his fellowship training at John Peter Smith Hospital in Fort Worth. He is licensed to practice medicine in Texas. He has been an employee of the Bureau, working at Federal Medical Center Fort Worth, just over three years. He defines his duties as a clinical director, which includes helping physicians in the ambulatory clinic when needed.

When he sees a patient for the first time, he reviews his or her previous medical records, looking for the past medical diagnosis. He saw Powell on November 28, 2014. He had never seen him before, and did not see him after that date. Powell complained of pain level 7 on a 0 to 10 scale, which meant a moderate to severe pain. When he saw Powell, Powell did not appear to be in pain. Powell could move his arms, including the left arm where the bullet was located. He manipulated the bullet in Powell's scapula. He could feel the bullet under Powell's

skin. It was superficial under the skin, i.e., it was right on top, close to the skin. He could see that an object was there.

Powell's vital signs did not indicate that he was experiencing pain. He explained what vital signs would be indicative of pain. However, he said that "[s]ome patients may have more pain tolerance, some may not have that much"; and, the expectation that vital signs would disclose pain in a patient would "sometimes depend on how long the patient had gotten used to the pain." Id. at 96.

In Powell's case, if the pain was genuine, he would refer Powell to the general surgeon to take a look at him. "That's what [he] did in this case." Id. at 97. Even though Powell's vital signs did not indicate serious pain, he has "to go with whatever the patient tells [him]." Id. That is "[b]ecause one patient may have more tolerance for pain than somebody else." Id. at 98.

Based on his physical findings when he saw Powell on November 28, 2014, he did not believe that the bullet needed to be removed. He put in the consultation request because Powell wanted the bullet to be taken off, "and as the patient's physician, [his] responsibility [was] to forward that request." Id.

He discussed Court Exhibit 1.[5] The exhibit shows that, even though the witness had requested consultation with a general surgeon, Powell was never actually given such a consultation. He referred to page 209 of Government Exhibit 1, which indicates that his November 28, 2014 request for surgical consultation was acted on on December 10, 2014, and the entry showing the action indicates that the UR Committee disapproved of the request for consultation, stating that they wanted more information from the primary care team. In Powell's case, the primary care team would be Powell's primary care provider, and that would be Dr. Eilert. He does not know if the UR Committee received the additional information they needed. The page 209 entry indicates that the request was to be referred back to Dr. Eilert, as the primary care provider. The witness did not know whether that was ever done. The record indicates that the UR Committee did not actually act on the consultation request, but that the request

---

[5]Court Exhibit 1 is a document that was marked by the court, and received in evidence at the trial, to put in context testimony of Dr. Fateh Hyder concerning the document. The document first came to the court's attention in response to an order the court issued August 25, 2017, seeking information concerning the outcome of surgical consultation requests made by Drs. Eilert and Fateh Hyder on behalf of Powell. Doc. 72 at 3-6; Doc. 73 at 3 & Attach. Because of the extreme redactions that were made in the version provided to the court by the government's August 25, 2017 filing, the court issued an order on August 25, 2017, directing the government to file an unredacted copy under seal, Doc. 74, with which the government complied on August 28, 2017, Doc. 75, Attach. The unredacted copy was discussed during the trial, which unfortunately did not cause meaningful information to be provided. Doc. 86 at 99-111. As Powell pointed out in a post-trial document he filed on September 11, 2017, the most probable reading of the document is that Powell's referral to the Utilization Review Committee for general surgery was not acted on by the Committee. Doc. 85.

was disapproved by Glinda Johnston, an RN acting in the role of UR Committee. The witness gave explanation as to why Ms. Johnston was shown as acting in the role of UR Committee, which did not make much sense.

While his examination and clinical findings did not disclose that Powell was in pain, if Powell really was in pain and he could not detect it from his examination, he still would have put in his request for Powell to consult with a general surgeon. In this regard, the witness testified:

> Q. [BY MS. COMPTON] In your medical judgment, did Mr. Powell need to have the bullet removed, based on your assessment when you saw him on November 28, 2014?

> A. Based on my exam and clinical findings, no, but since the patient was saying he was in pain, I put the consult in.

> THE COURT: Let's assume he really was in pain and you couldn't detect it. Would that have made a difference?

> THE WITNESS: Yes.

> THE COURT: And what difference would it have made?

> THE WITNESS: I would have still put the consult in.

> THE COURT: You would have what?

> THE WITNESS: I would still place the consult for him to see a general surgeon.

Id. at 111-12.

The record of his visit with Powell on November 28, 2014, shows that the witness ordered a ten-day supply of pain medication for Powell, to be taken two times a day, as needed. With respect to why he ordered the medication, he testified:

THE COURT: And how many times -- did you give him a quantity, a particular quantity.

THE WITNESS: I wrote for 500 milligrams of Naproxen, two times a day, as needed, for 10 days.

THE COURT: Okay. And did you indicate on here why you ordered that for him?

THE WITNESS: For his pain.

THE COURT: For his pain. Was that in his shoulder or upper arm that you ordered it?

THE WITNESS: Yes, sir.

THE COURT: And because of a foreign body in his shoulder or upper arm?

THE WITNESS: Yes, sir.

THE COURT: And what was that foreign body you were referring to there?

THE WITNESS: Most likely a bullet fragment.

THE COURT: The fragment of the bullet you felt?

THE WITNESS: Yes, sir.

THE COURT: Okay. And then under assessment, you -- one of the things you said about the shoulder, upper arm, foreign body without infection, you've got that that's something chronic, and that it's a current condition that's chronic? Is that what that means?

THE WITNESS: Yes, sir.

*THE COURT:* In other words, he's been bothered with that for some period of time?

*THE WITNESS:* Yes.

*THE COURT:* And that it hadn't improved over time? Is that what that means?

*THE WITNESS:* Yes.

Id. at 114-15.

There is no way he could tell what would have happened if there had been a follow-up like was recommended by Glinda Johnston, such as going back to the provider and providing the committee more information.

### c. Powell's Rebuttal

At the conclusion of the testimony of Dr. Fateh Hyder, Powell wanted to clarify that a nurse practitioner by the name of T. Walker, not Dr. Eilert, was designated as his medical care provider.

He told Ms. Walker about the pain in his shoulder, and about the problems he was having with his sleep. Powell gave the following explanation as to why Ms. Walker did not remove the bullet:

*MR. POWELL:* Well, you know, she was aware of all the incident that was going on since I've been there, you know, and she had me scheduled for X-ray, and the X-ray had came back in, and once the X-ray came back in, it was three months later before he looked at it.

*THE COURT:* Well, did she ever say anything about the possibility of you having surgery to remove it?

*MR. POWELL:* No, sir. She said it wasn't life threatening.

*THE COURT:* It wasn't what?

*MR. POWELL:* It wasn't -- it wasn't life threatening.

*THE COURT:* That was her reason for not removing it?

*MR. POWELL:* Yes, sir. Yes, sir.

*THE COURT:* Could she have removed it?

*MR. POWELL:* If she would have signed for it.

Id. at 119.

Ms. Walker is the nurse practitioner who saw Powell on December 29, 2014, Gov't Ex. 1 at 139, which is the last visit Powell had with medical personnel at FMC Fort Worth before he performed his self-surgery in early-January 2015.

### d. Further Questioning of Dr. Eilert by Court

At the conclusion of Powell's explanation concerning Ms. Walker, the court questioned Dr. Eilert about Ms. Walker's role in the care and treatment of Powell. He answered as follows:

*THE COURT:* Okay. I was trying to understand what -- Nurse Walker, what role she had in his care. Can you explain that to me?

*THE WITNESS:* Yes, sir. She's a mid-level provider, which is a nurse practitioner or a physician's assistant. So when patients come to the clinic during

34

the week, they file a -- it's called a sick-call slip. They have a complaint, maybe a cold, or something is bothering them, or some kind of pain, or whatever injury they may have, and they don't see the doctors, they see a nurse practitioner or a physician's assistant.

THE COURT: And what do they do if they think he needs some care beyond what they can give him?

THE WITNESS: They can -- most likely they will do a consult to the URC committee, or they will consult one of the doctors to see if something more can be done.

THE COURT: Well, when he goes from Nurse Walker to you, does that mean that she's made arrangements for him to see you in this case?

THE WITNESS: If she did, yes.

THE COURT: That would be how you would end up seeing him?

THE WITNESS: Yes.

THE COURT: Because Nurse Walker had made that arrangement?

THE WITNESS: Yes.

THE COURT: Okay. And did -- I guess the same thing, every time he saw a medical doctor, it would be because his primary care provider, I believe -- is she called a primary care provider?

THE WITNESS: Yes, she would be.

THE COURT: She's made arrangements for him to see a medical doctor?

THE WITNESS: She could have, yes.

Id. at 120-22.

## The Court's Conclusions as to Pertinent Legal Principles

By statute, the "Bureau of Prisons, under the direction of the Attorney General, shall . . . provide suitable . . . care . . . of all persons . . . convicted of offenses against the United States . . . ." 18 U.S.C. § 4042(a)(2). As the Supreme Court noted in United States v. Muniz, "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." 374 U.S. 150, 164-65 (1963). Powell had the right to bring this action under the FTCA for breaches of that duty. Id. at 150. See also Cowart v. United States, 617 F.2d 112, 116 (5th Cir. 1980); and, Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976).

The duty of care owed by the Bureau to inmates requires "the exercise of ordinary diligence to keep the prisoners safe and free from harm." Cowart, 617 F.2d at 116; Jones, 534 F.2d at 54. In order to recover for a failure of the Bureau to comply with one of its § 4042 obligations, "a plaintiff must show that the Government was negligent in the exercise of its responsibilities." Jones, 534 F.2d at 54. The evaluation of the legal merit of Powell's claim includes an inquiry as to whether the Bureau acted unreasonably in failing to remove the bullet

from Powell's body when it knew or should have known that proper care of Powell would require its removal.

Pertinent to the instant action is the Third Circuit's decision in <u>Jones v. United States</u>, 91 F.3d 623 (3d Cir. 1996). The federal prisoner in that case alleged that prison officials denied him his prescription high blood pressure medication, causing him to suffer a debilitating stroke, which left him aphasic and quadriplegic. The district court granted the motion of United States for summary judgment because of its conclusion that there was no evidence that there was a duty by the Bureau to provide the plaintiff his prescription medication at a certain time. The Third Circuit said that evidentiary proof was not required because "[w]hether a defendant owes a duty of care to a plaintiff is a question of law," <u>id.</u> at 624 (citation and internal quotation marks omitted), and explained that the legal duty the government breached was the duty articulated in § 4042(a)(2) that the Bureau of Prisons shall provide for the care of all persons convicted of offenses against the United States, <u>id.</u> Pertinent to the instant action, the Court said that:

> The statute is unambiguous, and to avert summary judgment, Jones was not required to provide a further basis for his contention that defendant had a duty of care toward him. <u>United States v. Muniz</u>, 374 U.S. 150, 164-65, 83 S. Ct. 1850, 1859, 10 L.Ed.2d 805 (1963).

("[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042. . . .").

The facts are undisputed that Jones had been prescribed medicine to treat his condition; that the medicine had been withheld; and that he then suffered a severe stroke-just what the medicine was designed to prevent-which left him permanently disabled. We conclude that this evidence is sufficient to allow a jury to determine that the government breached its legal duty of care toward Jones by failing to provide him with his medication within twelve hours of its normal prescription time.

Id. at 625. As in Jones, as a matter of law in the instant action, the government owed a duty of care to Powell to remove the bullet from his body when Bureau personnel became aware of facts indicating that it should do so. Its failure to do so was an institutional failure of the kind that § 4042(a)(2) was intended to prevent.

This court is dealing here with a statute that the Supreme Court specifically held in Muniz created a duty of care owed by the Bureau to a federal prisoner, a violation of which can form the basis of action under the FTCA. Muniz, 374 U.S. at 164-65. However, as the Third Circuit held in Jones, supra at 37-38, an action against the government by an inmate who has not received proper medical treatment can be brought by the inmate pursuant to the provisions of 18 U.S.C. § 4042. Jones, 91 F.3d at 625.

Moreover, this court is not considering that a mere violation of § 4042 is a basis for concluding that the government has been guilty of actionable conduct. Rather, the court, as has the Fifth Circuit, requires proof of the failure to exercise ordinary diligence, or of unreasonable conduct, as a predicate to a finding of liability under § 4042. See, Cowart, 617 F.2d at 116; Jones, 534 F.2d at 54. For instance, the mere failure to provide proper medical care to an inmate is not actionable, but a failure to exercise ordinary diligence to provide proper medical care is actionable, assuming that the inmate has suffered a loss which was proximately caused by such a breach of the Bureau's statutory duty of care. Persuasive is the Supreme Court's holding in Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955), that once the government has undertaken to perform a certain activity, it becomes obligated to use due care in the performance of that activity, failing in which it would be subject to liability under the FTCA. It follows that if the government fails to use due care in performing its duties under § 4042(a)(2), and damage results from that failure, the government is liable under the FTCA.

To whatever extent the court is required to look to state law to determine whether the conduct of the prison officials caused there to be an actionable violation of the statutory

§ 4042 duty, the tort laws of Texas and Indiana would "flesh out" the elements of liability. An accurate statement of a basic principle of Texas tort law is that "[t]he fundamental purposes of the tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims." 70 Tex. Jur. 3d, Tort Liability § 2 at 235-36. And, "[i]n order to establish tort liability, a plaintiff must prove the existence and violation or breach of a legal duty owed to the plaintiff by the defendant." Id. § 7 at 243 (footnotes omitted). The court has no reason to think that the state law of Indiana would not be basically the same as Texas law; and, the court presumes that it is.

In the instant action, the court has concluded that there has been an actionable violation of the Bureau's statutory § 4042 duty to Powell, with the consequence that Powell should be compensated for his damages proximately caused by that violation as a deterrence to other wrongful conduct, his losses should be shifted to the responsible party, the Bureau, and Powell should be fairly compensated as a deserving victim.

Even if the court were to accept the view advanced by plaintiff that Powell's case is nothing other than a typical medical malpractice case brought under the FTCA, the result would be the same. In a case the government has cited in support of

its position,[6] Hannah v. United States, 523 F.3d 597 (5th Cir.

2008), the Court explained the plaintiff's burden under Texas law

of proving medical malpractice, stating that:

> Under Texas law, in a medical malpractice action, the plaintiff bears the burden of proving (1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation" Quijano v. United States, 325 F.3d 564, 567 (5th Cir. 2003). The plaintiff must establish the standard of care as a threshold issue before the factfinder may consider whether the defendant breached that standard of care to the extent it constituted negligence. Id. "Unless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman, expert testimony will be required" to meet the plaintiff's burden of proof. Hood v. Phillips, 554 S.W.2d 160, 165-66 (Tex. 1977).

Hannah, 523 F.3d at 601. In the instant action, the evidence so

strongly supports the conclusion that the Bureau's medical

personnel should have removed the bullet from beneath Powell's

skin, any knowledgeable layperson, having the ordinary

experiences of life and normal intelligence and reasoning skills,

would have known that the bullet should have been removed long

before Powell performed his self-surgery. It is a matter of

common knowledge, and within the general experience of

laypersons, that a foreign object just under the skin that is

causing pain and interfering with sleep, should be removed.

---

[6]The government relied on Hannah in support of the Motion to Dismiss Amended Complaint for Medical Malpractice it filed August 10, 2017. Doc. 59 at 4.

If the conclusion were to be reached that evidence of a standard of care by Fort Worth practitioners under the circumstances involving Powell's care were to be required, the court is satisfied that the trial testimony of the two doctors called by the government as witnesses would provide evidence of that standard. Both of the doctors admitted, in effect, that the bullet should be removed if it was causing Powell significant pain and interfering with his sleep; and, Dr. Eilert testified that if a private physician in Fort Worth were to be faced with such a situation, he probably would take those factors into account in his decision making. He added that the level of care provided at FMC Fort Worth is the same level of care that doctors in Fort Worth would provide, except that a private practitioner in Fort Worth would probably take into account to a greater degree the long-term benefits of the treatment, such as relieving the patient of pain and making the patient sleep better, in determining the treatment to provide.

Thus, whether Powell's suit is viewed to be an institutional action against the Bureau under § 4042(a)(2) or a malpractice action against individual medical care providers, the result would be the same. This court's belief is that it should be viewed to be an institutional § 4042(a)(2) action against the Bureau. Otherwise, because of the time frame and the number of

health care providers involved,[7] the court would have the task of evaluating in a medical malpractice context the conduct of the multitude of Bureau's healthcare providers that participated over a lengthy period of time in disregarding Powell's complaints and in failing to honor his pleas that the bullet be removed.

IV.

## Findings of Dispositive Facts

The trial evidence establishes the following dispositive facts, which the court finds from a preponderance of the evidence on the basis of direct evidence or as the most reasonable inferences to be drawn from circumstantial evidence:

1.   At all times since no later than July 23, 2009, Powell has been an inmate in a facility of the Bureau by virtue of having been convicted of an offense against the United States. He was confined by the Bureau at its Milan, Michigan facility from no later than July 23, 2009, until he was transferred to the Bureau's Terre Haute, Indiana facility in August 2013, where he remained until he was transferred to the Bureau's FMC Fort Worth facility in March 2014, where he has been confined since that date.

---

[7]In addition to the many medical practitioners who actually saw Powell for an evaluation of his condition, a large number of medical personnel were involved through a committee in the decisions of whether the bullet should be surgically removed. Doc. 86 at 111; Ct. Ex. 1 at 1.

2.    At all times since no later than July 23, 2009, the Bureau, under the direction of the Attorney General, has had an obligation to provide suitable care of Powell, as required by 18 U.S.C. § 4042(a)(2).

3.    On numerous occasions, starting on July 23, 2009, and continuing through December 29, 2014, Powell made known to medical personnel of the Bureau the existence of a bullet[8] in his left shoulder area, and of problems the existence of the bullet in his body were causing him.  The attachment to this memorandum opinion and order discloses information provided by Powell, and complaints made by Powell, to medical personnel of Bureau over the years related to the existence of the bullet in his body. That information, and those complaints, were genuine and truthful.

4.    The attachment hereto describes the responses of medical personnel of the Bureau to information given and complaints expressed by Powell to the personnel over the years.

5.    Starting sometime before Powell's January 31, 2014 clinical encounter with a medical doctor at the Bureau's Terre Haute facility, the Bureau has continuously failed to provide

---

[8]The item in Powell's body sometimes is referred to in the records, and in other documents, as a "bullet," and on other occasions as a "bullet fragment."  For convenience, the court is referring to the item in Powell's body as a "bullet."

suitable care to Powell in relation to the bullet embedded in his body. At all times starting with and since that January 31, 2014 encounter up until Powell removed the bullet himself, the Bureau failed to exercise ordinary diligence, and failed to use due care, in the care it was providing to Powell in relation to the bullet embedded in his body.

6. On and before January 31, 2014, Powell had provided medical personnel of Bureau sufficient information concerning problems the existence of the bullet in his body were causing him to obligate Bureau to remove the bullet from Powell's body so that he no longer would be experiencing those problems. Bureau's failure to comply with that obligation violated § 4042(a)(2) and was a failure of Bureau to exercise ordinary diligence and due care in the care of Powell.

7. Starting in January 2014, while Powell was an inmate at Terre Haute, and continuing thereafter until Powell removed the bullet through his self-surgery in January 2015, the Bureau, through its medical personnel, was negligent in failing to remove the bullet from Powell's body.

8. The repeated refusals of medical personnel of Bureau to remove the bullet from Powell's body were never based on a valid reason. Instead, invalid considerations entered into the refusals, such as the inconvenience and cost to Bureau of doing

45

so, the belief that the existence of the bullet in Powell's body was not life threatening, the belief that removal of the bullet was something Powell could take care of himself once he had completed the service of his 188-month term of imprisonment that commenced in January 2009, or the belief that the bullet might be evidence in a legal proceeding.

9.   The existence of the bullet in Powell's body has caused him all the problems he described to medical personnel of Bureau, as set forth in the attachment hereto; and, over the years it has caused Powell injury and damage in the form of physical pain, mental anguish, and physical impairment.

10.  Powell's decision to remove the bullet from his body himself, through self-surgery, was made because Powell reasonably believed that the Bureau would not take the necessary steps to care for him by removing the bullet in an appropriate surgical setting.  The negligence of Bureau in the care it was providing Powell left him no choice but to remove the bullet himself. Powell's self-removal of the bullet, without use of something to deaden the pain, caused injury or damage to Powell in the form of pain.  The failure of the Bureau to perform its statutory duty to care for Powell was a proximate cause of Powell's decision to remove the bullet himself and the pain he suffered in doing so.

11. Had Powell been under the care of a private physician, instead of the medical personnel of the Bureau, at any time starting while he was in Terre Haute, going through Powell's self-removal of the bullet, the private physician upon learning of the problems the bullet in Powell's body was causing Powell, would have promptly arranged for surgical removal of the bullet. That is true as the situation existed when Powell was seen by a medical doctor in Terre Haute on January 31, 2014, again when he was seen by Dr. Eilert in April 2014, again when he was seen by Dr. Fateh Hyder on November 28, 2014, and again each time when he was seen by a registered nurse or a nurse practitioner at FMC Fort Worth during the year 2014. In each instance, the failure of the Bureau's medical personnel to cause the bullet to promptly be removed from Powell's body constituted a failure to exercise ordinary diligence and due care in the provision of care by the Bureau to Powell as required by § 4042(a)(2).

12. Powell was seen by a Bureau physician while an inmate at the Bureau's Terre Haute facility on January 31, 2014, when Powell made the report to the physician that is disclosed on pages 158-59 of Government Exhibit 1. On that visit the Terre Haute physician recorded that Powell anticipated a transfer soon, and was advised to present to health services at the receiving facility regarding removal of the bullet, noting that it was

"just under the skin." Id. at 159. With the information the examining physician had when he examined Powell on January 31, 2014, the physician should promptly have removed the bullet from Powell's body or promptly caused it to be removed. His failure to do so was unreasonable and constituted negligence.

13. To whatever extent the testimony of either Dr. Eilert or Dr. Fateh Hyder indicated that he did not believe when he saw Powell that the bullet needed to be removed from Powell's body, such testimony was not credible. Each of them, when he saw Powell, realized, and understood, that the bullet should be removed from Powell's body. Otherwise, neither would have sought approval from a committee for surgical removal of the bullet. The court does not accept as true any reason either of those doctors gave for a belief on his part that the bullet did not need to be removed from Powell's body. Each of them should promptly have removed the bullet from Powell's body, or promptly caused it to be removed, when he saw Powell. In each instance, the physician's failure to do so was unreasonable, and constituted negligence.

14. Dr. Eilert probably took into account in deciding not to remove the bullet from Powell's body (a) the possibility that he would be criticized by the Bureau for doing so rather than to let Powell do it himself, or cause it to be done, after he had

served his term of imprisonment, or because of the cost to the Bureau of accomplishing such a removal, or (b) the possibility that the bullet could serve as evidence in some legal proceeding, or (c) a combination of those considerations. None of those was a valid reason excusing Dr. Eilert from promptly removing the bullet or taking steps to cause it to be removed. If he had been exercising ordinary diligence he would have done so promptly upon seeing Powell in April 2014.

15. Any knowledgeable layperson, having the ordinary experiences of life and normal intelligence and reasoning skills, would have known at all times, starting no later than January 31, 2014, and going through the date on which Powell self-removed the bullet from his body, that the bullet should have promptly been removed. It is a matter of common knowledge and within the general experience of laypersons that a foreign object just under the skin that is causing pain and interfering with sleep should be removed promptly.

V.

## Damages to Be Awarded to Powell

All of the difficulties Powell had by reason of the existence of the bullet in his body, at all times starting in January 2014 and continuing until Powell's self-removal of the bullet in January 2015, were proximately caused by the negligence

of the Bureau in failing to remove the bullet as part of its care of Powell as a person convicted of an offense against the United States, as contemplated by § 4042(a)(2).

The court finds that Powell suffered significant injury and damages that were proximately caused by the Bureau's negligence in failing to provide the care to Powell that it was statutorily required to provide. While putting a dollar value on physical pain, mental anguish, and physical impairment is a difficult undertaking, the court has decided, from its experiences in presiding over litigation, that the damage amounts set forth below are reasonable assessments of the compensable damages Powell suffered as a proximate result of the negligent conduct of the Bureau.

The court has taken into account that as time went by starting in January 2014 until January 2015, the intensity of Powell's daily suffering by reason of the bullet in his body increased. The daily dollar amounts the court has assigned to his damages are a fair average for the daily damages suffered by Powell from January 31, 2014 until he removed the bullet himself on January 5, 2015, a total of 340 days.

The compensable damages the court is awarding Powell consist of:

1.  For physical pain experienced by Powell at the rate of $75.00 per day for each of the 340 days, for a total of $25,500.00.

2.  For physical impairment suffered by Powell, including interference with his normal life activities, such as sleep, at the rate of $50.00 per day for each of the 340 days, for a total of $17,000.00.

3.  For emotional anguish suffered by Powell at the rate of $25.00 per day for each of the 340 days, for a total of $8,500.00.

In addition, the court finds that Powell experienced physical pain while self-removing the bullet for which he should recover another $500.00.

The grand total of those elements of damage is $51,500.00, which is the amount of compensable damages the court is awarding Powell for the damages he suffered as a proximate result of the negligent failure of the Bureau to comply with its statutory obligation to provide him appropriate care.

VI.

Order

Therefore,

The court ORDERS that Powell have and recover as his damages
the amount of Fifty-One Thousand Five Hundred and 00/100 Dollars
($51,500.00) from United States of America.

SIGNED September 21, 2017.

_____
JOHN McBRYDE
United States District Judge

<u>Pertinent Parts of Bureau of Prisons' Medical Records</u>
<u>as to Otis D. Powell</u>

The medical records that were provided in the Government's Exhibit 1 disclose the following information pertaining to Powell's attempts to obtain from the Bureau of Prisons appropriate care pertaining to the migrating bullet, starting with a complaint to medical personnel at Milan, Michigan, in July 2009, continuing through Powell's decision to remove the bullet by self-surgery in early-January 2015.

<u>While an Inmate at Milan, Michigan</u>

<u>July 23, 2009</u>

He was seen on July 23, 2009, with one of his current medical conditions being described as "bullet ini [sic] left shoulder causing numb hand." Gov't Ex. 1 at 006.

<u>December 17, 2009</u>

On December 17, 2009, his complaint to the Milan medical personnel was "I want lower bunk. I have a GSW at the left arm- in 2007 and it shattered my left elbow." <u>Id.</u> at 002. His examination at the time disclosed "Left upper extremity: + coolness at left hand, keloid scars at forearm, + weakness at left hand -on fingertip test, w/slight muscle atrophy at ulnar side of left hand." <u>Id.</u> at 003.

1

<u>February 3, 2010</u>

Powell made a request of a prison doctor that he would like to be put back on the doctor's call list to see the doctor about two things, including "a bullet in [his] lower shoulder." <u>Id.</u> at 086.

<u>March 25, 2010</u>

Powell informed a prison doctor that "He has a numb left arm from a GSW and wonders if he'll ever get the feeling back"; and he was told by the doctor that "if it had been more than 1 year since the injury any further nerve recovery was unlikely." <u>Id.</u> at 045.

<u>August 29, 2011</u>

Powell saw a doctor with his chief complaint being "Have a bullet lodge on his left upper back and want it remove" and "States he was shot at the back in 2007" and "States that the bullet hurts when he lay down." <u>Id.</u> at 090. Upon examination, the examiner noted under the headings "Skin" and "Lesion Location" the entry "Yes: Upper Back L" and "Presence of bullet fragment at the left scapular area." <u>Id.</u> The examiner put under the heading "Health Problem Comments" the entry "Bullet fragment left upper back." <u>Id.</u> at 91. The record shows that the examiner made a radiology request for "General Radiology-Scapula-General

Attachment to Memorandum
Opinion and Order dated
September 21, 2017, in
Case No. 4:16-CV-1130-A
Page 2 of 14

[Left]," giving as the reason for the request "Bullet fragment location." Id.

September 12, 2011

Radiology report says "There is a bullet measuring 1 x 2 cm apparently in the soft tissues just posterior to the mid-portion of the body of the scapula." Id. at 107.

September 30, 2011

Record indicates that Powell inquired of medical personnel about the results of his left shoulder x-ray, and was "Advised that the result is normal." Id. at 089.

While an Inmate at Terre Haute, Indiana

August 6, 2013

In a record of physical examination at Terre Haute, the entry under the heading "Current Painful Condition" is "reports having a bullet in left shoulder, intermittent pain." Id. at 124.

In records showing that a "Transfer Date" of August 6, 2013, there is a listing under the heading "Health Problems" and subhead "Chronic" "weakness at left hand-S/P GSW left arm- 2007." Id. at 127.

January 13, 2014

Report of clinical encounter with an RN at Terre Haute shows that his complaint is "left shoulder problem from lodged bullte [sic]," showing a "Pain Scale" of 6 and "Pain Qualities" as

3

"Burning/Sharp." Assessment on this record shows "left shoulder problem from lodged bullte [sic]. x 1 yr," and showing under the heading "Schedule" and subheading "Activity" the entry "Sick Call/Triage" scheduled for January 16, 2014 for "left shoulder problem from lodged bullte [sic]. x 1 yr." Id. at 161.

January 31, 2014

Record of clinical encounter with medical doctor at Terre Haute showing that inmate

> reports GSW with bullet lodges in left scapula about5 [sic] 1 year ago. States the bullet has migrated and now just under the skin and uncomfortable. Takes Ibuprofen. Request that it be removed.

Id. at 158.

In this same record, a report of the examination of the "Shoulder" is "nodule just under the skin mid-left scapula. Non-Tender, Mobile, No Induration." Id. at 159. Under the heading "Plan" there is the entry:

> As inmate anticipates transfer soon, he was advised to present to health services at receiving facility regarding removal of bullet. It is just under the skin and does not present any musculoskeletal impairment.

Id.

March 26, 2014

On a form titled "Bureau of Prisons, Health Services, Inmate Intra-system Transfer" listed under the heading "Health Problems"

4

and subhead "Chronic" are the words "weakness at left hand- SP GSW left arm- 2007." Id. at 167.

### Since Becoming an Inmate at Fort Worth, Texas

April 3, 2014

This appears to be the initial medical evaluation of Powell upon his transfer from Terre Haute to Fort Worth. In a record titled "Bureau of Prisons, Health Services, Health Screen," under the heading "Current Painful Condition" and subheading "Location" there is the entry "Left Shoulder Blade-Bullet Location Causing Pain. Reports Pending Surgery Before Transfer," and under the heading "Observations" and subheading "Comments" appear the words "bullet to left side upper back." Id. at 165.

April 4, 2014

In record of Powell's visit with Dr. Eilert, under the heading "Chief Complaint" and subheading "Subjective" appear, inter alia, the words "Has bullet under skin over left scapula requesting surgical removal of bullet"; and, under the heading "Exam" and subheading "Skin" appear the words "Lump in shape of bullet under skin superficial moveable over left scapula." Id. at 155.

In this same record of Powell's visit with Dr. Eilert, the following entries appear:

New Consultation Requests:

<u>Consultation/Procedure</u>     <u>Due Date</u>

General Surgery          04/08/2014          . . . .
    Reason for Request:
        Please schedule with next inhouse gen surgery
        visit for evaluation of bullet under skin
        superficially over left scapula patient
        requests removal.
    Provisional Diagnosis:
        Bullet superficially under skin over left
        scapula

<u>Id.</u> at 157.

The "Consultation Request" shows that the request was being made by Dr. Eilert, that the Consultation Request's "Ordered Date" was "April 4, 2014," and that the "Scheduled Target Date" was "April 8, 2014." <u>Id.</u> at 204.

In what appears to be a part of the same Consultation Request document, there is a heading on page 3 "Request Approval Actions," where the entry is made "Disapproved by Baruti, A. MD acting in the role of Institution Clinical Director on 05/06/2014." "Comments: No clinical indication for removal." <u>Id.</u> at 206.

<u>April 23, 2014</u>

In a document bearing this date titled "Bureau of Prisons, Health Services, Inmate ISDS Report," included under the heading

6

"Health Problems" is the entry "weakness at left hand-S/P GSW left arm- 2007." Id. at 169.

June 17, 2014

In record of Clinical Encounter by Powell on this date with a registered nurse, under the heading "Complaint" is the entry "I have a bullet that is coming out," and under the subheading "Pain Location" are the words "Back-Upper," and under the subheading "Pain Scale" is the number 6, and under the subheading "Exacerbating Factors" is the entry "'Bullet in my back,'" and under the subheading "Relieving Factors" are the words "'I take about 4 ibuprofen at night, but it doesn't help.'" Id. at 152.

On the second page of the same record are the following entries:

ASSESSMENT:

> Foreign Body
> Inmate has had multiple complaints of same
> issue; he is requesting that the bullet under
> his left scapula be removed. States it is
> causing him "real bad" pain, especially at
> night. Foreign body can be felt under left
> scapula. Inmate did not appear to be in
> distress during this encounter. Will
> schedule for further eval by provider.

PLAN:

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|----------|---------------|--------------------|
| Sick Call/Triage | 06/23/2014 00:00 | MLP 03 |

Requesting to have bullet removed from under left scapula.

Id. at 153.

July 3, 2014

In a "Dental Health History Screen" bearing this date, one of the entries under the heading "Health Problems" is "Bullet fragment left upper back." Id. at 183.

July 9, 2014

In record of clinical encounter Powell had with what appears to be a nurse practitioner on this date, the following entries appear:

> Chief Complaint: Skin Problem
> Subjective:      41 yo AA male with hx of GSW, requesting
>                  to have bullet removed from left upper
>                  scapula area.  Bullet has been lodged
>                  for seven years.  Inmate reports
>                  discomfort at site after seven years.
>                  Inmate advised not life threatening at
>                  this time.  If condition worsens return
>                  to clinic.

Id. at 150.

November 28, 2014

This is the date of the Clinical Encounter record of Powell's visit with Dr. Fateh Hyder.  Under the heading "Chief Complaint" and subheading "Subjective," there is the entry "42 yo AAM with h/o GSW to left chest and shoulder in 2007.  Now c/o pain left scapular pain x 5-6 months and got worse 2 days ago."

Under the subheading "Pain Scale" appears the number 7, and by the heading "Pain Qualities" appears the word "Burning," and by the subheading "Comments" appear the words "Left scapula" and "Feels bullet fragment aqnd [sic] wants it taken off." Under the main heading "ROS" and subheading "Musculoskeletal" are the words "Left scapular pain." Id. at 147.

On page 2 of this same record is an entry under the heading "Exam" and subhead "Musculoskeletal" "Left scapular: Logged and palpable bullet fragment noted." Id. at 148. Further down on the same page are entries noting the foreign body in Powell's shoulder and upper arm without infection, and that it is "Chronic, Not Improved/Same." The record shows that the doctor made a radiology request giving as the reason for the request "GSW in 2007, palpable Bullet fragment present." Id.

In a Medication Summary that appears to be related to the November 28, 2014 Clinical Encounter Powell had with Dr. Fateh Hyder, there is a record showing that the doctor prescribed Naproxen 500 mg tablet for Powell, to "take one tablet by mouth with food twice daily as needed." Id. at 182.

Apparently part of the same record is Dr. Fateh Hyder's Consultation Request, which has the words "General Surgery"

following the heading "Consultation/Procedure Requested," and has

the following entries below that:

> **Reason for Request:**
> General surgery- inmate c/o left scapular pain,
> lodged bullet fragment.
> Wants to take the bullet fragment off
>
> **Provisional Diagnosis:**
> General surgery- inmate c/o left scapular pain,
> lodged bullet fragment.
> Wants to take the bullet fragment off

Id. at 207; see also id. at 149.

December 10, 2014

In what appears to be the response to Dr. Fateh Hyder's

Consultation Request, there is a document titled "Consultation

Request" that has the following entries:

> **Request Approval Actions:**
> Refer up to UR Committee by Fateh Hyder, Syed
> MD/CD acting in the role of Institution Clinical
> Director on 11/28/2014.
> Disapproved by Johnson, Glinda RN/IDC/IOP acting
> in the role of UR Committee on 12/10/2014.
> Comments: Refer back to provider. Mobility?
> Please provide more information. Consult PT/OT if
> needed.

Id. at 209.

Undated

An undated document titled "Bureau of Prisons, Health

Services, Consultation Report" pertains to both of the

Consultation Requests that were made on behalf of Powell after he

arrived in Fort Worth, the first by Dr. Eilert and the second by

Attachment to Memorandum
Opinion and Order dated
September 21, 2017, in
Case No. 4:16-CV-1130-A
Page 10 of 14

Dr. Fateh Hyder.  Id. at 269.  This document shows that both

requests were disapproved, but does not indicate why Dr. Eilert's

request was disapproved.  It indicates that Dr. Fateh Hyder's

request was disapproved because of "Limited Medical Value."  Id.

December 16, 2014

There is a record of a Clinical Encounter Powell had on

December 16, 2014, with a registered nurse with his "Chief

Complaint" being "Pain," and with the entry by "Subjective,"

"'Having pain in shoulder and neck,'" and with the entry beside

"Pain Location" the words "Shoulder-Left," and with the entry by

"Pain Scale" the number 7, and with the entry by the words "Pain

Qualities" the words "Pins and Needles," and with the entry by

the subheading "Comments" the words "Hx of GSW in 2007. Fragment

lodged in back."  Id. at 144.

Under the heading "Assessment" in this same record is the

following entry:

> Pain - Shoulder
> Inmate presents to sick call with complaints of 7/10
> numbing pain to left shoulder.  Inmate has hx of GSW to
> left chest and has fragments of the bullet in his back.
> General surgery consult was put in by Clinical
> Director.  Consult was disapproved.  Will schedule
> follow-up with MLP.  Inmate verbalized understanding of
> plan of care and returned to housing unit.

Id. at 145.

Attachment to Memorandum
Opinion and Order dated
September 21, 2017, in
Case No. 4:16-CV-1130-A
Page 11 of 14

December 22, 2014

Record shows Clinical Encounter of Powell with registered nurse on December 22, 2014, with his Chief Complaint being "Pain" with the entry under the subheading "Subjective" "pain in left shoulder and neck," the entry by "Pain Location" of "Shoulder-Left," with the "Pain Scale" shown to be 6. Id. at 141.

Under the heading "Assessment" in this record, the following entry appears:

> Inmate with foreign object to left shoulder. History of gunshot wound. States that it is causing pain in shoulder and neck. Reports for the last 6 days, inability to sleep on back, has intermittent "pins and needles" feeling to left side and arm feels "paralyzed" at times. Prescribed anti-inflammatories are ineffective. Told inmate he'd be placed on call out for assessment by provider. Verbalized understanding.

Id. at 142.

December 29, 2014

On December 29, 2014, Powell had a Clinical Encounter with a nurse practitioner with the following complaint:

> Inmate requesting bullet removed from left shoulder blade d/t GSW seven years ago. Inmate reports difficulty sleeping on left side and discomfort. Inmate has made multiple attempts at this facility and previous facility to have bullet removed. Inmate advised consult to general surgery was disapproved. Advised not medically indicated at this time. Inmate states, "will just have to write somebody up to get this removed." Xray results pending.

Id. at 139.

In this same record under the heading "Assessment" is the entry "Shoulder upp arm superfic foreign body w/o infect 912.6-Current Chronic Not Assessed." Id. at 140.

December 29, 2014

An x-ray report showing an exam date of December 29, 2014, relating to an x-ray of Powell's left scapula says that it is negative except for "ballistic fragment." Id. at 192.

January 6, 2015

Record of Clinical Encounter shows that on January 6, 2015, Powell was seen by a registered nurse concerning his wound from cutting the bullet out on January 5, 2015. Id. at 222. In the description of how the injury occurred, it says "Inmate states: 'I cut the bullet out.'" Id. This record contains a rather detailed description of the wound in the area where Powell cut the bullet out. Id. at 222-23.

The Remainder of 2015

The only other records for the year 2015 that appear to pertain to the area of Powell's body where he removed the bullet is a list of treatments during the month of January 2015 indicating that he received wound care several times during January, ending on January 20, 2015. Id. at 241. Another entry that appears to have potential relevance to the wound in that area of Powell's body is an entry pertaining to a Clinical

Encounter on January 23, 2017, showing a complaint by Powell that he was having a problem with his arm when he climbs up in his bunk. Id. at 219. He was requesting a lower bunk "due to difficulty climbing up to lower [sic] bunk after recent laceration." Id. The court takes the absence of any other records in the year 2015 to indicate that Powell's self-surgery to remove the migrating bullet solved the problems he was having because of its existence in his body.

All of 2016

The medical records pertaining to care and treatment by the Bureau of Prisons during the year 2016 consist of only twelve pages. Id. at 252-257, 259-260, 262, 266-268. No mention is made in the 2016 records pertaining to any problem experienced by Powell in the area of his body where the migrating bullet was located and self-removed, again indicating that Powell's self-removal of the bullet relieved him from the difficulties about which he had been complaining because of its presence in his body.

14